53 F.3d 332
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Augustus OYAIRO, Defendant-Appellant.
 No. 94-5699.
 United States Court of Appeals, Sixth Circuit.
 May 1, 1995.
 
 Before: KENNEDY and DAUGHTREY, Circuit Judges; and CLELAND, District Judge.*
 PER CURIAM.
 
 
 1
 A jury convicted defendant, Augustus Oyairo, on two counts of entering into a sham marriage for the purposes of evading the immigration laws. Defendant now appeals, alleging three claims of error: whether the District Court erred in admitting the testimony of a forensic document examiner; whether the District Court erred by allowing the government to impeach a defense witness with an old conviction, and whether the jury's verdicts are supported by sufficient evidence. We affirm.
 
 I.
 
 2
 On December 22, 1987, defendant, a citizen of Nigeria, entered the United States as a non-immigrant visitor for pleasure. He was authorized to stay in the United States until February 1, 1988, and he was not allowed to work while in this country. At some point in time, however, defendant began working at the Bethany Health Care Center.
 
 
 3
 On June 17, 1988, defendant applied for a marriage license for himself and Helen Newsom. That marriage never occurred. Sometime in July or August, a man named Victor, who was acquainted with defendant, asked Teresa Sims to marry defendant. Sims is mentally disabled and had three children. Victor explained that defendant needed to get married to obtain a green card and promised to pay Sims several hundred dollars if she agreed to marry defendant. Sims agreed and the marriage took place on August 11, 1988. Apparently, Sims and defendant met for the first time shortly before the wedding. On August 16, 1988, five days after the wedding, defendant applied for a lease at the Holly Hills Apartment complex. On the application, defendant listed himself as single. He rented the apartment with a man named Simon Iyawe.
 
 
 4
 A month later, on September 15, 1988, INS agents conducted an investigation at Bethany Health Care Center. The agents had received a tip that the center was employing illegal aliens. During the investigation, the agents questioned defendant about the fact that he had not departed the country by February 1 as required. Defendant informed the agents that he had married an American woman and had documents at his apartment to prove it.
 
 
 5
 Defendant accompanied the agents to his apartment. At the apartment, the agents did find the marriage license for Sims and defendant, as well as a package of information from the INS regarding applying for permanent resident status. The agents also found several blank or unsigned draft affidavits on letterhead from a Nigerian court. The documents related to a divorce between defendant and a Nigerian woman named Grace Imade.
 
 
 6
 The INS filed charges against defendant and began deportation proceedings. A friend of defendant's posted his bond. After his release, defendant moved in with Sims for approximately three weeks. When he moved out, defendant left some clothes with Sims so it would appear he was still living with her. On October 12, 1988, Sims filed a Petition for Alien Relative, seeking to obtain permanent resident status for defendant. Accompanying the petition were several documents allegedly showing that defendant and his Nigerian wife had divorced on June 30, 1987. The INS eventually denied this petition, concluding that Sims and Oyairo had not proven that they were both free to marry.
 
 
 7
 On April 8, 1991, Sims and defendant married again, and Sims filed another Petition for Alien Relative. In May or June of 1992, the INS dismissed the administrative proceedings against defendant and referred the case to the United States Attorney for federal prosecution. On May 27, 1992, defendant filed for a divorce from Sims. The divorce was finalized on December 29, 1992, and defendant married Tracie Groves on the same day. In February 1993, Groves filed a Petition for Alien Relative with the INS.
 
 
 8
 On August 4, 1993, the government filed a superseding indictment charging defendant with two counts of marrying Sims for the purposes of evading the immigration laws. Count one related to the August 11, 1988, marriage, and count two related to the April 8, 1991, marriage. At trial, Nancy Berthold, a forensic document examiner, testified that the documents from the Nigerian court were counterfeit. In addition, both Sims' mother and brother testified that they did not know that Sims had married defendant, even though they had frequent contact with her. The jury convicted defendant on both counts of the indictment. Defendant now appeals.
 
 II.
 
 9
 A. Admission of Document Examiner's Testimony
 
 
 10
 Defendant raises two issues with respect to the admission of the document examiner's testimony--whether the testimony amounted to impermissible impeachment by collateral evidence and whether, even if relevant, the testimony was sufficiently reliable. Defendant contends that the testimony was not reliable because the document examiner testified regarding information beyond her field of expertise. At trial, defendant objected only on the former grounds, and not on the latter. Thus, while we will review the first argument fully, we will review the second issue only for plain error.
 
 
 11
 Defendant's first argument rests on the contention that the fraudulent document evidence is not relevant to the charges against him. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The government charged defendant with entering a sham marriage for the purposes of evading the immigration laws. The government introduced the fraudulent documents to show that defendant was not divorced from his first wife at the time he married Teresa Sims. Accordingly, the documents were relevant to a fact at issue and were not impermissible collateral evidence. The District Court did not err in allowing the document examiner to testify.
 
 
 12
 Defendant raises for the first time on appeal several questions about the document examiner's qualifications. There can be no doubt, and defendant does not argue, that Nancy Berthold possesses the requisite background to qualify as an expert witness regarding questioned documents. Defendant, however, argues that Berthold's testimony exceeded the areas of her expertise in several respects. Specifically, defendant challenges Berthold's testimony regarding the practices and procedures in Nigerian divorce courts, regarding the validity of certain signatures, and regarding whether certain seal impressions were counterfeit.
 
 
 13
 Berthold's involvement in this case began when the INS sent her various documents purporting to show that defendant and his Nigerian wife were divorced. The INS asked Berthold to determine whether these documents were valid or were counterfeit. Because she knew nothing about Nigerian divorce courts, Berthold needed to gather some background information as part of her analysis. At trial, the prosecutor asked her to start by explaining this background information to the jury. In response to this question, Berthold stated:
 
 
 14
 Well, pretty much I am an expert in questioned documents. I am an expert in the construction of fraudulent documents. I am not an expert in Nigerian society, however, I do have to know certain things which we found out through our liaison with the State Department and numerous references that we have on file in our laboratory about what is required for a divorce to take place in Nigeria.
 
 
 15
 JA 90. Berthold then proceeded to give the jury a brief overview about divorce in Nigeria. While it is true that Berthold is not an expert in this area, she did not present herself as one. Instead, she conveyed basic information to the jury that she gathered through normal channels. These are the channels established to assist document examiners in determining whether a particular document is counterfeit. Thus, the District Court did not err in permitting this testimony. Even if the court did err, that error was not prejudicial because Berthold presented several independent reasons to support her finding that the documents were counterfeit; her conclusions were not dependent on her knowledge of Nigerian divorce proceedings.
 
 
 16
 Defendant next challenges Berthold's testimony regarding the validity of certain signatures. Defendant argues that because Berthold did not obtain samples of valid signatures from the parties who allegedly signed the documents she examined, she had no basis for comparison and for concluding that the signatures were forged. Berthold testified that several of the signatures on the documents she examined were "unnatural." When asked to define that term, she stated:
 
 
 17
 It means that the slant changes from side to side. It has blunt ending strokes. It has tremor. There is patching. In other words, when you and I write our signatures, our hand doesn't have to think of where to go and we don't come up with bizarre letter forms. In fact, most of the time when people are signing they are totally unconscious of their act of signing. It is a natural habit for them.
 
 
 18
 When someone makes up a signature, there is a lot of signs that it is, in fact, an unnatural signature, to a document examiner.
 
 
 19
 JA 96. Given Berthold's qualifications as a forensic document examiner, this is exactly the type of conclusion and reasoning one would expect. The District Court did not err in allowing this testimony.
 
 
 20
 Berthold also testified that several "wet seals", or rubber stamp impressions, were counterfeit. In making this determination, Berthold compared the stamps to ones obtained from the Nigerian court. Defendant argues that Berthold did not obtain all the stamps used by the Nigerian court at the relevant time, and that therefore she could not be certain that the impressions on defendant's documents were counterfeit. During direct examination, the prosecutor asked Berthold whether the stamp impressions were valid. She replied, "[n]o, they are not. They did not conform to the ones on file and they have extensive handwork. They appear to have been hand-cut out of something." JA 93. A few questions later, the prosecutor again inquired as to what made the stamps invalid. Berthold testified, "Well, not to mention that the design does not match the true stamp that was in use during that time period, but the fact that when the stamp was made, it wasn't typeset. It actually appears to have been cut out of something by hand." JA 93. Despite not having seen every type of stamp used by the Nigerian court during the relevant time, Berthold did present sufficient evidence to support her conclusion that the stamp impressions were counterfeit. Accordingly, the District Court did not err in allowing this testimony.
 
 B. Impeachment of Defense Witness
 
 21
 One of defendant's witnesses, Penny Iyawe, was convicted of simple robbery in 1976. During cross-examination, the prosecutor used this conviction to impeach Iyawe's testimony. Defendant objected, but the District Court allowed the prosecutor to ask about the prior conviction. The Federal Rules of Criminal Procedure provide that
 
 
 22
 Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect....
 
 
 23
 Fed.R.Crim.P. 609(b). The government concedes that the lower court erred in allowing the impeachment of Iyawe. According to the government, however, the error was not prejudicial.
 
 
 24
 Penny Iyawe testified that she met Teresa Sims Oyairo on four different occasions and that defendant and Sims appeared to have a true marriage. Three of those four times were in late 1988, after the INS had arrested defendant. The fourth time was in 1989, when Iyawe travelled with defendant and Sims to Memphis for their INS interview.
 
 
 25
 At most, this error impaired Iyawe's credibility, but her testimony did not provide much support for defendant. All of Iyawe's testimony related to time periods when Sims and Oyairo made a concerted effort to appear married. The government, however, provided overwhelming evidence that these efforts were false and that Sims and Oyairo did not have a true marriage. Accordingly, this error was not prejudicial, and it does not provide us with grounds to reverse defendant's conviction.
 
 C. Sufficiency of the Evidence
 
 26
 Defendant also argues that the government did not present sufficient evidence to support the verdict. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The evidence recounted above shows that the government presented more than enough evidence to support defendant's conviction.
 
 III.
 
 27
 For the foregoing reasons, we AFFIRM the District Court's judgment.
 
 
 
 *
 The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation